Thank you very much. All right, so we're going to go on to case number two. And that case is 22-1194, Brian Orozco v. Cook County. And, hello, Ms. Nicholas. Good morning. This court has twice remanded this case with instructions to the district court to determine what the Cook County jail's policy is with regard to books and magazines that are seized from inmates pursuant to the jail's three-book limitations. The district court has twice failed to heed this court's instructions. Instead, the district court made a determination that because Mr. Cogar received notice of the jail's three-book policy and notice of the jail's intention to enforce that policy, he received all the due process that was due before his books were summarily destroyed. This decision was in error because, as this court previously recognized, it improperly conflated two distinct interests that Mr. Cogar had in his books. First, the possessory interest, which he lost by keeping too many books in his cell, and second, the property interest, which he did not automatically forfeit. This case should be remanded for a third time for a determination of what the jail's policy actually is with regard to property that is otherwise lawful, that is confiscated from inmates pursuant to limitations on the property they may keep in their cell, and a determination of how that policy was applied to Mr. Cogar. Ms. Nicholas, you used the word... Sorry, go ahead, Judge. No, please, you go. All right. Thank you. Ms. Nicholas. Oh, Cogar is not... He hasn't responded to the jail's argument that he had no property right in the books under Illinois law. We typically look to state law to define property rights in the first place. Can you respond to that argument now? Can you distinguish Webb versus Lane? Well, yes. Under the state law about what constitutes contraband, books do not fall into that category. There are illegal items in which someone would not have an arguable property interest if they were in their cell in the jail. However, books are the type of item wherein a person can forfeit their right to possess those items by having more than the permissible amount in their cell. However, that does not automatically forfeit someone's property interest in those books. A lot of the dispute then in this case is about the meaning of the word contraband, isn't it? Contraband is used very loosely throughout the proceedings. That's right. And I think that's the essential core problem with the jail's policies here, which is that they have a policy whereby illegal items and otherwise lawful items that are just in excess of the limits placed by jail policy are both defined as contraband. And a very predictable result of that is that jail officials who are tasked with enforcing these policies will then decide that it's perfectly permissible for them to dispose of that kind of property when confiscated from inmates, throw it in the trash, or take it home for themselves. And when you've authorized jail officials to enforce a policy like that, it's of course necessary for the jail to have a policy about what should be done when materials are confiscated. It's a very predictable result, what happened here. Now your client, did he ever avail himself of the remedies or any of the remedies that we know were afforded? Did he ever try to mail these out? Did he ever try to have someone pick them up? Did he ever do anything to help himself out here? Well, so as far as we know, he did not attempt, before the books were confiscated, to mail them home first. But there is a reason for that. One, which is that throughout his incarceration in the Cook County Jail, he had every reason to believe he was permitted to keep extra books in his cell, because not only was he permitted to keep 30 to 40 books at all times, so was everyone else around him. Second, once the books were taken away, he didn't have any opportunity to avail himself of that process, because all the books were thrown in trash bags and tossed in the garbage. Of course there was some kind of notice given that this shakedown was going to take place, right? Yes, so there is some testimony in the record that some jail officials were walking around the jail, perhaps a day or two before this search occurred, saying, hey, we're going to be enforcing this three-book policy, you might want to think about getting rid of your books. And so that did give Mr. Coger notice that the three-book policy was going to be enforced. But that's different from authorizing a total deprivation of the books, his property interest in the books, permanently discarding those books, throwing them in the garbage, or the guards taking them home. And I think there's a couple of Supreme Court cases, well, first I'll start with a case that was cited by a defendant, which is Trigg. And there the question was whether verbal notice of a policy about drug testing was sufficient to then punish the inmate for refusing to take that drug test. And of course the notice there was sufficient to enforce the policy. So applying that here, it was sufficient to enforce the policy against Mr. Coger. But enforcement of that policy means taking the property away, taking it out of the cell. It does not follow that it was automatically justifiable for guards to then summarily discard that property. So he was willing to take the risk, the books might be removed from the cell, but not willing to take the risk that they were going to permanently deprive him of the books. I think that's exactly right, because of course when people are booked into the Cook County Jail, they often have property with them. They might have a watch, a wedding ring, their clothes, their phones, their wallets. And of course the jail doesn't have the right to just say, well, you're being booked into jail, we're going to throw all of that in the garbage. In fact, the jail handbook talks about those particular items, doesn't it? What to do with the watch and the wallet. That's right, and the jail has a policy whereby that property is returned to you upon your release. Now, what the jail doesn't have any clear policy about is what happens to property that is otherwise compliant with the law, things like books, that are confiscated from inmates simply because they have too many of them. Let me follow up on that, because the word policy has been used quite a bit. It strikes me that with regard to the book, the three book, that's an express policy if we end up getting to the Monell analysis, correct? That's right. With regard to the, quote, policy, end quote, with regard to the book destruction, do you assert an implied policy, a gap in the policies? It wouldn't be an express policy, right? That's exactly right. It's a gap in the policies where a policy was absolutely necessary. Whereas here you have authorized the jail officials to confiscate this property, you need to have something in place that determines what they do after they do that. What the evidence in the record shows here is that it was very loose and discretionary. Could the jail have refused to deliver any books in excess of three to Cogar's cell? That's a very interesting question, because of course it could have done that if it was going through. It could have done it. So if so, what did he lose here? Perhaps the senders of the books would have a claim. But if the prison could have lawfully kept him from taking possession of the books in the first place, how can we say it was problematic to deprive him of the books when they realized he had more than allowed? That's a great question. So the jail's mailroom does have a policy about what happens with property that's mailed to an inmate that they're not allowed to have. And that policy requires them to either store it in the inmate's property to give to them when they leave or to return it to the sender. So in either of those instances, Mr. Cogar would not have lost his property interest in the books. He would have been deprived of the possessory interest, which we all agree would have been appropriate here. He did not have a possessory interest in the books or in having more than three books in his cell at any one time. But the property interest was permanently deprived of that. So that's what Mr. Cogar lost here. Had the mailroom made the decision not to deliver those additional books to him, he never would have taken possession of the books. So the possessory interest wouldn't have even been at issue. But once he obtained those books, and I'm sorry, Judge. I wondered if he ever grieved to this issue. I mean, did he file a grievance or anything after the books were taken? So there's a couple reasons he did not. One is that he was released from jail less than two weeks later, and there would not have been sufficient time for the grievance process to even play itself out, even for him to receive a response to the grievance. Two, there was no remedy available to him under the grievance process. The books were already destroyed. They were thrown in the garbage. And compensation for the loss of that property is not an available remedy. How do we know, though? How do we know the time frame as to when the books were thrown in the garbage or destroyed versus the two weeks later when he left the jail? So there's testimony in the record from another inmate in the same unit of the jail whose books were taken during the same search that he asked the guards immediately, what happened? Why did you do this? I'd like my materials back, because there were not only books but also some legal materials that that individual had lost. And that inmate saw that they were all in plastic garbage bags. All of the properties taken from the entire unit, everyone's books, their papers, their magazines were all thrown into trash, you know, 30-gallon trash bags, and were ready to go out. So we know from that that there wasn't any remedy available after the books were taken. There was no way to determine whose books were whose. They were all thrown in trash bags, and they were gone by that same day. So in light of that, Mr. Koger really didn't have any remedy under the jail's policies or grievance procedures. So the only remedy he really has is this lawsuit because he was deprived of due process pursuant to the jail's policy of letting the guards do whatever they want with confiscated property. See, letting them do it, but there was a policy of either it was a policy of allowing the prisoner to mail these out or have someone pick them up, right? Prior to their confiscation, yes. And of course, that was something that this court knew, and it's even in the court's decision. The last time it was here. So if that standing alone was enough, this case never would have been remanded. I agree that's problematic, but at the same time, doesn't that satisfy the due process clause? That's pre-deprivation due process, it sounds to me. So I think that it goes back to whether the notice and process was sufficient to enforce the rule prohibiting him from having more than three books versus to destroy those books, to permanently deprive him of his property. Those two are mentioned in the prisoner handbook or are not mentioned in the prisoner handbook? Those two means of getting rid of the books prior to a shake-down. I believe there is a mailroom policy whereby someone was informed of their ability to obtain envelopes and send items out. And so he knew about that, and he knew about that or had constructive notice about that. And you're not arguing that anybody impeded him from using that? There's really nothing in the record about that one way or the other. One way or another. Okay. I still have a very hard time then maybe help me out. I mean that sounds to me like pre-deprivation due process. And many of the cases indicate that's even superior to post-deprivation due process. So I think we have to distinguish which deprivation we're talking about. That was pre-deprivation process for the loss of his possessory interest in the books. But you have to have a pre-deprivation process for destroying the books, permanently depriving him of that. The pre-deprivation interest in the possessory interest also ensured the protection of his long-term possessory property interest, correct? See, I think the problem is that it is so open-ended because, of course, pursuant to the policy as it's written, as soon as he had four books, the guards were authorized to take at least one away, and there was nothing to stop them from immediately throwing it in the garbage. Now, under this court's decision in Streckenbach, that suggests that some kind of delineated time frame giving a reasonable real opportunity for someone to protect their property rights in their property would be appropriate. So basically what you're saying is when you're dealing with prison guards, you've got to spell it out. And the fact you can't trust the prison guard to infer from the post-office department's regulation that they were supposed to do something other than throw this away. That's exactly right. And this case is the perfect example of why such policy is necessary. So I see I only have a few seconds left, so I'll reserve the remainder of my time. Thank you. Thank you. All right. Good morning, Mr. Power. How are you? Very well. Thank you, Judge. And if Coger had a property interest in the books once they were removed from his cell, what process was in place for Coger to protect that property interest post-deprivation? What relief was available in the grievance process, for example? Well, for example, in the grievance process, and we may be getting a bit outside the record here, but through the grievance process, he could have notified superiors in the jail that his books were taken, and he could have filed a grievance challenging the three-book rule itself about the search, the impending search that he was given notice of, or after the fact that his books were taken. That's all. That would have gone up. I'm sorry? Please continue your thought, and then I'll stop you. That would have gone up the chain of command. Frankly, the grievance process is a somewhat fluid process. People could have looked into it. They could have taken appropriate action that they thought might have been necessary. At some level, it also could have ‑‑ there's a fund within the inmate services where they could have tried to acquire replacement books for Koger. It's not set in stone what the remedy might have been, is the point, that once the grievance got filed, the jail could react to it in various different ways. So the basic point is that this fellow should have stopped the garbage truck, right? He should have stopped this stuff from, once it was committed to the garbage system, he should have done something to stop it. Well, you know, I think it's worth repeating, Your Honor, that Koger himself testified that he thought his books returned into the jail library. Koger's own testimony was not that they were thrown away immediately. Well, you see, that's what he thought happened. He thought that happened, I gather, because that's what the policy was pre-shakedown. That's what would have happened to his books. He just inferred that these prison guards would have followed that policy, an inference which, unfortunately, was previously mistaken. The guards weren't going to follow the policy. Well, Koger actually testified that he heard that from other detainees on the tier. And if I could step back a second, Your Honor, to address a point counsel made in her opening, she faulted the district court for this issue of not looking into the policy of what the jail's policy is, of how they deal with books after they are confiscated. And there's a reason for that. And the reason is that after this court's second remand to the district court, the district court asked the parties for some guidance on what should happen next. And there's a status report in the record at ECF 196. And in the status report, defendants said that there was need for additional discovery on this issue about the due process and the process of what the jail does with books. Plaintiff, however, said, and I quote, Plaintiff believes the due process claim can and should be resolved on the record as a matter of law. Plaintiff therefore requests that this court set a briefing schedule for summary judgment. And so Plaintiff is the one who said, no, we don't need to do more discovery onto exactly what the jail's policy is. And we should decide this issue on the record as it stands now. And so to the extent there are questions about this, they're not questions of fact. They're just areas where Plaintiff has failed to meet his burden in coming forth with evidence to establish exactly what happened. Why did the prison keep delivering books to his cell after the first three? Is there any other category of contraband that the jail delivers to the inmate cell? I mean, if someone sent a Cobra birthday card containing cash or a pocket knife, what would the prison do with that mail? I mean, if it's contraband, why aren't they delivering it? Here, here's your contraband. And again, we might be going a bit outside the record, but I think the mailroom reviews mail that comes in. And if it's drugs or a knife or a shank, the contraband, the contraband will be kept out at that point in the mailroom. But then when it comes to the actual delivery, it's a jail wide system. It gets funneled out through various divisions, various tiers, then finally to the cells themselves. And so, no, the mailroom does not have someone go to each cell and count up each and every book before it's delivered. So the mailroom would deliver the mail, would set the process in motion for the mail to be delivered, for the books to be delivered. And then once Cogar received those books, it's up to Cogar to go through the process that's discussed in the briefs to count up how many he has. Again, there's no dispute that the three book rule is set forth in the handbook that every detainee has upon arrival at Cook County Jail. Cogar was serving a 300 day sentence at Cook County Jail. He knew he was only allowed to have three books, but instead he had more than 30. He could have mailed his excess books home. He could have given them to other individuals on the tier. He could have asked a friend to come to the jail and pick them up. Instead, he did nothing. And again, Cogar acquired these these 30 plus books over the weeks and months before the October 5th, 2013 search. He wasn't, you know, instantaneously out of compliance. He had weeks or months of being out of compliance with the rule, and he took no steps to divest himself of the excess books. And then again, the notice we're talking about is not only the notice in the handbook, but again, we have Cogar himself testifying that in the days leading up to the October 5th search, he was again specifically told, hey, you have too many books in your cell. You're going to need to get rid of your excess books. Look, forgive me, but the jail, you cited our opinion, Beckenbach versus Van Dessen, for the proposition that a policy authorizing destruction of inmate property cannot be condemned for authorizing destruction without notice when the policy itself gets noticed, which I think is your argument now. But the jail's policy here authorized only confiscation, right? Not destruction. I mean, what notice did inmates have here that their property would not just be confiscated, but would be destroyed if they did not remove it before a search? Your Honor, I think the notice is one in the same, that a detainee in a prison, a prisoner in a jail, should know that they're not going to get their contraband back. The other items like contraband, shanks, boots, weapons, detainees should know that if they're not, if these items are confiscated from them, they're not getting them back. And so that's the notice. Is a book contraband in the same sense as the items you just mentioned? So it is and it isn't, Your Honor. Isn't that the problem in the case? Well, Your Honor, there's no dispute that Cogar had more than three books. There's no dispute that he was left with three books after the search. So only items that are expressly defined as contraband were taken from Cogar. And so while books are clearly contraband, the jail does distinguish between different levels of contraband. There are general orders that the jail can take different steps with regards to certain kinds of contraband. There are internal disciplinary proceedings. Possession of excess books would qualify for a verbal warning. And I think maybe up to four days in segregation. Serious weapons, drugs. There are different levels of violations where they would lead to more time and segregation, more disciplinary procedures. Also, the jail reserve the right to refer these cases to the state's attorney for criminal prosecution. So while both are contraband, the jail is able to distinguish the levels between the different kinds of contraband. Aren't you ignoring Judge Easterbrook's earlier opinions about property versus possessory interest? No, Your Honor. And Judge Easterbrook said that just because a plaintiff lost a possessory interest in the books by keeping too many in a cell, he didn't automatically lose his property interest. And he also said that books are property. But he didn't say that Cogar had a property interest in those books. And again, just because while he may have not automatically lost his property interest by losing his possessory interest. Again, he never had that property interest to begin with. And that's the discussion here with under web, under controlling Illinois law. As Your Honor alluded to earlier, detainees in a prison setting don't have a property interest in contraband. And these due process issues, this question of whether or not detainees have a property interest in contraband to begin with, was not addressed by this court. The procedural history of this case is rather winding. But what came before the court was whether or not plaintiffs could even bring a due process point. And what this court ruled on previously, which Easterbrook ruled on, was that the possessory interest and the property interest are different things. And so the due process point had to be remanded back. And the first step in that due process analysis is whether or not Cogar even had a protected property interest to begin with. And when it comes to property interests, we look to state law. And the controlling state law here is web, which says that no, courts can look to criminal statutes as well as prison regulations, prison rules and regulations to define things as contraband. And if something's legitimately defined as contraband, then no, prisoners don't have a protected property interest in them. And Judge Easterbrook said, you know, just because an official says something is contraband, that doesn't make it contraband. And that's absolutely true. We'd agree with that. And in the web case, the court did a Turner analysis. And that's precisely the analysis that this court did in plaintiff's prior appeal. And looking through the Turner factors, the court in web found that the excess currency that the detainee had in his cell was appropriately called contraband, even though money is not generally contraband, money is not dangerous. And that's what this court did previously, that, yes, you and I might like to read books, a lot of people use books in legitimate ways, but there are legitimate concerns in a jail setting. Forgive me for a minute because I'm having a problem. When the jail accepted and delivered his mail. He had a property interest, right? I mean, and what about the first three books? He had a property interest in those, but nothing was distinguished when they threw them away, they just threw them away. I mean, presumably he had a property interest in the first three books he received. Well, at all times, his property interest was confined by the rules of the jail. When he only had three, he would have had a property interest in three. When he had more than that, though, it's any three. And plaintiff was left with three. We all agree that plaintiff was left with three books. But where did he say any three? Maybe the first three were really important to him, like his Bible, his mother's memoirs, heaven only knows what. Correct, Your Honor. And if there were three books that plaintiff found to be especially important to him, he could have protected those three by getting rid of the excess. He could have mailed the excess home. He could have given them to other detainees on the tier. He could have simply thrown them out and gotten rid of them. And in that way, he would have protected the three that he wanted to keep. And again, and so when the officials showed up at his cell on October 5th to conduct the search, they would have seen he only had three books. They would have left him with three books. Everything would have been fine. And so, you know, on that front, he was not deprived of more than three books. He was left with three books after the search. And then finally, Your Honor, with time running out, turning to the third point, the question of municipal liability. And plaintiff just admitted that there was no evidence of an express policy authorizing the destruction of these books, which means that they need to come forward with additional evidence of other times when books were summarily destroyed. And that's simply not in the record. And again, as stated earlier in that status report filed at Docker entry 196, plaintiff had the opportunity to develop the record on this issue. And plaintiff chose not to do so. Plaintiff wanted the case decided on the record as it stood at that time. And as this court recently decided in Bohannon in Indianapolis with the opinion just issued about a month ago on August 22nd, inaction only constitute a policy if there's evidence of a conscious decision not to take action. Plaintiff has put forward no evidence of a conscious decision not to take no action. And when it comes to a gaps in policy claim, a gaps in policy amounts to municipal action from Monell purposes only if the municipality has noticed that its program will cause a constitutional violation and typically notices established by a prior pattern of similar constitutional violations. Again, plaintiff has put forward no evidence of other times when books were taken pursuant to the free book rule and then summarily destroyed. Seeing that I'm asked out of time. If there are no further questions, we ask that you affirm the district court. Thank you. Thank you. Hey, Nicholas. You asked three minutes, and we'll give you your three minutes. I appreciate that. Thank you. Like to just respond to three points made by counsel and his argument. First, with regard to his citation to Bohannon, I think in that case, this court identified cases where a gap in policy could amount to a municipal policy that could give rise to liability. And that's where, as here, the need for a policy is so obvious that failure to have one amounts to deliberate indifference to constitutional rights. This is precisely that type of situation. The jail has authorized its officials to deprive inmates of property in excess of the amounts permitted by the handbook and not having a policy about what happens to that property when it's confiscated is naturally and obviously going to result in permanent deprivations of that property without due process. Second, it seems to be counsel's argument that Mr. Coger could have protected his property interest in the books by simply complying with the three-book rule. Of course, you could say that in any due process case. For example, in Venice versus Michigan, the person could have avoided loss of their vehicle by not allowing it to be used in the transport of drugs. In this court's decision in Miller, Mr. Miller could have protected his interest in his guns by not abetting other felons in having possession of guns. Or in Jones versus Flowers, somebody could have protected their home from being sold in a tax forfeiture by paying their taxes. That doesn't relieve the state of its obligation to provide due process when it seeks to deprive someone of their property permanently. Due process is still required before that permanent deprivation occurs. And then finally, with regard to whether state law would have defined these books as contraband such that it was appropriate to permanently deprive Mr. Coger of his books without any further process, this court cited in its decision the Illinois statute that defines what is contraband under Illinois law. And books are not included on that list. Therefore, it is not appropriate to automatically designate books as contraband in which Mr. Coger had no protectable property interest. So for all of those reasons, we ask that this case be reversed and remanded for those who sent forth in our briefing. Thank you. Thank you. Thank you both. The case will be taken under advisement. And the court's going to take a 10-minute recess. Thank you all.